## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-22396-CIV-ROSENBAUM/HUNT

ALUMNI CRUISES, LLC, d/b/a
Autism on the Seas,

       Plaintiff,

v.

CARNIVAL CORPORATION,

       Defendant.

_____/

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Carnival Corporation's Motion for Summary Judgment [ECF No. 32]. The Court has reviewed Defendant's Motion, all supporting and opposing filings, and the record. For the reasons that follow, the Court now grants in part and denies in part Defendant's Motion for Summary Judgment.

### *I.  Background and Material Facts*

Plaintiff Alumni Cruises, LLC, doing business as Autism on the Seas ("AOTS"), describes itself as a "Developmental Disability Cruise Service Provider" that "works with multiple cruise lines in order to provide vacation opportunities for developmentally disabled adults and families of children living with [a]utism, Down Syndrome, [c]erebral [p]alsy, Asperger['s] Syndrome, and other cognitive, intellectual and developmental disabilities." ECF No. 1 at ¶ 3. In exchange for a fee, *see* ECF No. 32-1 at 45:8-:24, AOTS coordinates with cruise lines to facilitate a vacation experience more responsive to AOTS's clients' special needs. Among other services, AOTS both secures the

agreement of cruise lines to provide special services and arrangements to AOTS's clients and provides its own staff onboard to assist with its clients' needs.[1]

AOTS and its clients have taken a number of cruises with Defendant Carnival Corporation. While AOTS concedes that Carnival has been somewhat accommodating of AOTS's clients' special needs, AOTS filed the pending lawsuit because it asserts that, under the Americans with Disabilities Act of 1990 ("ADA"), Carnival is required to make additional accommodations for AOTS's clients that Carnival is either averse to provide or unwilling to acknowledge that such accommodations are required by law.

The Complaint in this case alleges that Carnival has violated the ADA in a number of ways and suggests that Carnival is required to provide guests with developmental disabilities with certain reasonable accommodations, including the following:[2]

1.  Camp Carnival:  "[T]he hiring of a sufficient number of properly trained and skilled staff.  Such staff must be available on sequential shifts, at all times when Carnival daycare is open to children." ECF No. 1 at 9.

2.  Carnival Teen Club: "[T]he hiring of a sufficient number of properly trained and skilled staff to provide similar services and activities [to those offered at Carnival Teen Club], in a similar environment.  Acceptable similar environments can include an alternate venue or same teen club venue.  Such staff must be available on sequential shifts, at all times when

---

[1]On average, the number of special-needs children that AOTS brings onboard is ten per cruise.  ECF No. 32-1 at 47:24-48:7.  The total number of passengers (including both special-needs children and their family members) traveling with AOTS on any given cruise is, on average, fifty.

[2]The Complaint also alleges that Carnival must make a reasonable accommodation for in-cabin babysitting.  *See* ECF No. 1 at ¶ 15.VI.  But AOTS has acknowledged that it included this category in its Complaint in error and agrees to dismissal of this aspect of the Complaint.  *See* ECF No. 38 at ¶ 3.

Carnival teen club is open to teens." *Id.* at 10.

3.   Port check-in: "Families of developmentally disabled individuals should be permitted to either check-in via an expedited check-in counter or by an expedited process designed for families with a developmentally disabled guest, and position trained staff members at the check-in and embarkation waiting areas in order to greet and assist developmentally disabled passengers while waiting for ship embarkation (after check-in)." *Id.* at 10-11.

4.   Muster drill: "Provide a designated muster drill area for individuals with developmental disabilities and their families, with an amended process for communicating drill information. Provide trained staff to assist in the specially designated muster drill area in order to help with handling and care of guests with special needs, and provide headsets for individuals with special needs who are affected by drill alarms." *Id.* at 11.

5.   Dining room: "Position tables for developmentally disabled guests against walls that have windows, in order to allow guests to access the windows and occupy their time while waiting for service, without disrupting other cruise guests. Provide for expedited food service for families with developmentally disabled children, keeping in place the overall process, but expediting so that it lasts for no more than forty-five (45) minutes. Provide skilled staff to assist families during dinner and to attend disabled guests when needed and when disability characteristics manifest." *Id.* at 11-12.

6.   Use of venues: "Provide specified times when these venues are reserved for developmentally disabled guests and provide for skilled staff to accompany and assist guests in these venues." *Id.* at 12.

7.   Photo opportunities: "Provide private opportunities for developmentally disabled guests to have their picture taken at a specified time each day, or at least 50% of the number of the nights of the cruise, and provide staff to assist families and to attend to the guests in the event that disability characteristics manifest themselves during photo opportunities." *Id.* at 13.

8.  Tender: "Provide a specific time of day when families with developmentally disabled children can board an otherwise empty tender and provide such families with a designated space large enough for each child to have sufficient room to move. Provide trained staff to accompany families on the tender to attend to the guests and to assist as needed when disability characteristics manifest themselves. Provide staff trained to be able to accompany such guests when in port and to return with them on the tender for assistance." *Id.* at 13.

9.  Port excursions: "Provide a properly trained staff member to accompany developmentally disabled persons upon request." *Id.* at 14.

10. Disembarkation: "Families of developmentally disabled individuals should be permitted to disembark by an expedited disembarkation process to be designed by Carnival in compliance with all applicable laws and regulations applicable to the disembarkation process." *Id.*

11. Publication of services: "Publicize availability of services and facilities that provide fair and equal access to developmentally disabled persons on each Carnival cruise, as long as guests inform Carnival Corporation, or as long guests inform an affiliated "Developmental Disability Cruise Service Provider" 60 days prior to the cruise." *Id.*

For its part, Carnival submits evidence — including admissions by Michael Sobbell, the owner of AOTS — that Carnival has provided many of the accommodations described above. But Sobbell has also testified that Carnival has been inconsistent in making some of these accommodations, and, despite the provision of the accommodations that it has given, Carnival insists that the law does not require it to make any of the requested accommodations. In addition, Carnival contends — without citation to any evidence — that implementing the requested modifications to Camp Carnival would impose "administrative and financial burdens on Carnival that fundamentally alter the nature of the Camp Carnival program." ECF No. 32 at 25. Thus, Carnival seeks summary judgment that the

ADA does not require it to make any modifications for people with developmental disabilities.

## II.  Discussion

### A.  Standard on a Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009).  The Court does not weigh conflicting evidence. *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007).  Nor does the Court determine the credibility of witnesses.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted).  Upon discovering a genuine material dispute, the Court must deny summary judgment and proceed to trial. *Id.* at 1292.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some

metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

Local Rule 56.1, S.D. Fla., further factors into this Court's consideration of a motion for summary judgment. Under Local Rule 56.1, a party moving or opposing summary judgment must submit a "statement of the material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a). The rules require these statements be supported by "specific references" to evidence on the record. S.D. Fla. L.R. 56.1(a)(2). The Local Rules expressly caution, "All material facts set forth in the movant's statement filed and supported as required above will be *deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis added). But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on the record supports the uncontroverted material facts that the movant has proposed. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

B. *Justiciability*

Article III of the Constitution extends the jurisdiction of federal courts only to "Cases" and "Controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992) (citation omitted). The case-or-controversy restriction, in turn, imposes a dual limitation on federal courts, generally known as "justiciability." *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244 (11th Cir. 1998) (citing *United States v. Florida Azalea Specialists*, 19 F.3d 620, 621-22 (11th Cir. 1994) (citing *Flast v. Cohen*, 392 U.S. 83, 94-95 (1968))). Justiciability doctrine serves two purposes: (1) it aims to prevent the judiciary from infringing on the powers of the executive and legislative branches, and (2) it seeks to ensure that the judiciary considers only those matters presented in an adversarial context. *Id.* (citing *Florida Azalea Specialists*, 19 F.3d at 621-22). Grounded in "concern about the proper — and properly limited — role" of an "unelected, unrepresentative judiciary" in our democratic society, justiciability doctrine imposes "fundamental limits on federal judicial power." *Allen v. Wright*, 468 U.S. 737, 750 (1984).

Justiciability doctrine is composed of "three strands": standing, ripeness, and mootness. *See Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244 (11th Cir. 1998). Carnival argues that this case implicates two of those three concepts: standing and mootness. But despite Carnival's arguments to the contrary, AOTS enjoys standing to bring this lawsuit, and Carnival's actions to date have failed to moot the controversy.

1. Standing

At an "irreducible constitutional minimum," standing imposes upon a plaintiff the requirement to make the following three showings:

(1)     the plaintiff must have suffered an "injury in fact" – an

> invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical[;]'"
>
> (2)     there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court[;]" and
>
> (3)     it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Socialist Workers Party*, 145 F.3d at 1244 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. at 560-61 (citing *Simon v. Easter Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976))).

In the case of an organization, standing may arise in two different contexts. First, an organization may enjoy standing in its own right. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). That is, where an organization itself has experienced an injury in fact and seeks to vindicate its own rights, it has standing to pursue claims arising out of those injuries. *Id.* Included within this type of standing is an organization's ability to assert the rights of its members to the extent that the challenged practices negatively affect the associational ties of the organization's members. *Id.* (citing *NAACP v. Alabama*, 357 U.S. 449, 458-60 (1958); *Anti-Fascist Committee v McGrath*, 341 U.S. 123, 183-87 (1951) (Jackson, J., concurring)). This kind of standing is referred to as "organizational standing." *See, e.g.*, *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (discussing organizational standing).

In the second type of standing that an organization may have, an organization may enjoy standing "solely as the representative of its members." *Id.* (citation omitted). To qualify for this type of standing, an organization must establish that (1) at least one of its members would have standing

to bring an individual claim regarding the challenged practice; (2)the interests that the organization seeks to protect "are germane to the organization's purpose;" and (3) individual participation of each injured party is not indispensable to either the claim brought or the relief sought in the case. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). While the first two requirements of this test are "constitutionally mandated standing requirements," the third stems from prudential concerns. *Access 4 All, Inc. v. L & D Investors Sunrise, Inc.*, 2011 WL 69848, *1 (S.D. Fla. Jan. 10, 2011) (citing *United Food & Commercial Workers Union Local 751*, 517 U.S. 544, 556-57 (1996)). Courts refer to this kind of standing as "associational standing." *See, e.g., Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1353-54 (11th Cir. 2009) (discussing associational standing); *see also Ga. Latino Alliance for Human Rights*, 691 F.3d at 1260 n.6 (distinguishing between "organizational standing" and "associational standing").

Here, AOTS's Complaint invokes both types of standing. In Count I, AOTS relies on associational standing in that it alleges that Carnival has violated its members' rights under the Americans With Disabilities Act, 42 U.S.C. § 12181, *et seq. See* ECF No. 1 at 4-16. Count II, on the other hand, implicates organizational standing by asserting that AOTS has incurred monetary damages as a result of "fill[ing] the void left by Carnival's failures" to comply with the ADA.

Carnival takes issue with AOTS's associational standing to bring Count I, noting a split of authority regarding whether associational plaintiffs have standing to enforce Title III of the ADA and urging the Court to adopt the analysis set forth in *Association for Disabled Americans, Inc. v. Concorde Gaming Corp*, 158 F. Supp. 2d 1353 (S.D. Fla. 2001), and *Concerned Parents to Save Dreher Park v. City of W. Palm Beach*, 884 F. Supp. 487, 488 (S.D. Fla. 1994). *See* ECF No. 32 at 13-14. In those cases, the courts determined that associational plaintiffs lacked standing to maintain

a separate ADA claim on behalf of their members because they could not satisfy the third prong of *Hunt* in that "any finding of an ADA violation requires proof as to each individual claimant." *Association for Disabled Ams., Inc.*, 158 F. Supp. at 1363-64 (quoting *Concerned Parents*, 884 F. Supp. at 488). *Concerned Parents* further elaborated, adding, "[T]he relief afforded to each claimant would require an individualized assessment of what measures the City must take in order to comply with the ADA on a case-by-case basis." 158 F. Supp. at 488 (citing *Terre Du Lac Ass'n v. Terre Du Lac, Inc.*, 772 F.2d 467 (8th Cir. 1985)).

　　While this Court certainly understands and appreciates the reasoning in *Association for Disabled Americans* and *Concerned Parents*, *Terre Du Lac Association*, the case on which *Concerned Parents* relied in reaching its conclusion, was not an ADA case. Instead, it involved claims under the Land Sales Act, 15 U.S.C. § 1709(a). In explaining the basis for ruling that associational standing was not appropriate for the Land Sales Act claims, the *Terre Du Lac* Court noted that Section 1709(a) authorizes damages and specific-performance remedies, and "[a] damages remedy for a Land Sales Act violation would clearly require individualized proof necessitating the individual participation of the Association members." 772 F.2d at 471 (citing *Associated Gen. Contractors v. Otter Tail Power Co.*, 611 F.2d 684, 689-90 (8th Cir. 1985)). But the court expressly distinguished cases involving injunctive relief as generally appropriate for associational standing. *See id.* (citing *Associated Gen. Contractors*, 611 F.2d at 689-90 for the proposition that "associational standing is traditionally denied in section 4 antitrust actions, which seek treble *damages* awards, due to the need for 'precise knowledge of the . . . injury to each plaintiff', whereas in section 16 antitrust actions, which seek *injunctive* relief, associational standing is not denied unless the association is an inappropriate representative for some reason") (emphasis in original).

Count I of the Complaint in the pending case seeks injunctive relief only.

Moreover, other cases in this district have concluded that Eleventh Circuit precedent suggests the existence of associational standing in a case such as this one. *See, e.g., Access 4 All, Inc. v. Atl. Hotel Condo. Ass'n, Inc.*, 2005 WL 5632057, *5 (S.D. Fla. Aug. 17, 2005) (citing *Doe v. Stincer*, 175 F.3d 879 (11th ir. 1999)). In *Stincer*, the Eleventh Circuit considered whether a protection-and-advocacy organization established under federal law had standing under the ADA to challenge a state statute on behalf of people with mental-health disabilities. Although the court's analysis opined on the standing of a statutorily created advocacy association, in holding that the association enjoyed standing, the Eleventh Circuit stated, "[T]he Advocacy Center may sue on behalf of its constituents like a more traditional association may sue on behalf of its members." 175 F.3d at 886. This Court agrees with the courts in this circuit that have concluded that this reasoning demonstrates that *Stincer* "implicitly found that associational standing existed for organizations bringing suit pursuant to the ADA." *L & D Investors Sunrise, Inc.*, 2011 WL 69848 at *2; *see also Atl. Hotel Condo. Ass'n, Inc.*, 2005 WL 5632057 at *5; *cf. Disability Advocates & Counseling Grp., Inc. v. Betancourt*, 379 F. Supp. 2d 1343, 1356-61 (S.D. Fla. 2005) (finding associational standing exists in ADA cases where declaratory, injunctive, or other forms of prospective relief are sought and that Southern District of Florida judges "who have not dismissed Plaintiffs' cases for lack of standing have implicitly found Article III standing in over 75 cases by entry of final judgments for Plaintiffs"). Accordingly, the Court finds that AOTS enjoys associational standing to bring Count 1 of the Complaint.

2.  Mootness

Carnival further contends that even if AOTS has standing to bring its ADA claim, all aspects of that claim but one — that the ADA requires Carnival to provide a better ratio of staff members,

-11-

including staff members who are specially trained to deal with AOTS's clients particular needs, to children in its Camp Carnival program — are moot because Carnival has already agreed to the modifications that AOTS has requested.  While AOTS concedes that Carnival has, in fact, made some changes that AOTS has sought, it argues that Carnival has failed to make all modifications requested.  And, AOTS adds, even if Carnival had done so, that fact would be irrelevant to determining whether the case had become moot since Carnival has not acknowledged that the law requires it to make any of the changes that AOTS has sought, and Carnival could cease its voluntary modifications at any time.

The concept of mootness, like that of standing, arises out of Article III's limitation of federal courts' jurisdiction to "Cases" and Controversies."  "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Ethredge v. Hall*, 996 F.2d 1173, 1175 (11th Cir. 1993).  When a case becomes moot, it ceases to be an active "Case" or "Controvers[y]," and the court must dismiss the case for lack of jurisdiction.  *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335-36 (11th Cir. 2001) (citation omitted).

Voluntary cessation of challenged conduct, however, does not necessarily deprive the court of jurisdiction.  *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531 (11th Cir. 2013) (citation omitted).  When a defendant voluntarily ends the behavior that is the subject of a plaintiff's lawsuit, generally, nothing precludes that defendant from returning to its presuit ways, in the absence of a court order.  *See id.* (quoting *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010)).  As a result, a defendant "bears a heavy burden of demonstrating that his cessation of the challenged conduct renders the controversy moot."  *Id.* (quoting *Harrell*, 608 F.3d at 1265 (quotation marks omitted)).

To satisfy this burden, a defendant must demonstrate both that (1) no reasonable expectation exists that the alleged violation will recur, and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Harrell*, 608 F.3d at 1265 (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979) (citations omitted by *Harrell* Court)) (quotation marks omitted). The Eleventh Circuit has described this burden as requiring a defendant to demonstrate that "it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id*. (quoting *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1131 (11th Cir. 2005) (emphasis added by *Harrell* Court) ( citation omitted)).

This burden Carnival has not met. While Carnival points to evidence that it has made certain modifications to many of the processes and programs about which AOTS complains, *see, e.g.*, ECF No. 32 at 5-7, ¶ 2, AOTS takes issue with the alleged lack of uniform employment of many of these modifications. *See, e.g.*, ECF No. 38 at 4-7, ¶ 2 (citing evidence). In addition, AOTS asserts that some modifications do not proceed far enough. *See id.* And, AOTS worries, when this litigation ends, Carnival will cease providing modifications that do provide the relief that AOTS seeks, as no court order will require it to keep the modifications in place, and Carnival insists that the law does not require the modifications that it has voluntarily made. *See id.* Carnival does not respond to these concerns in its reply brief in support of its Motion for Summary Judgment. Based on this record, the Court cannot find that Carnival has demonstrated that "it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *See Harrell*, 608 F.3d at 1265 (citation omitted). As a result, the Court concludes that this case is not moot.

## *C.  Count I*

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis

of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. . . ." 42 U.S.C. § 12182(a). Congress enacted this statute to "remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). To establish a Title III claim, a plaintiff must demonstrate that (1) he or she is an individual with a disability; (2) the defendant is a place of public accommodation; and (3) the defendant discriminated against the plaintiff within the meaning of the ADA. *Norkunas v. Seahorse NB, LLC*, 444 F. App'x 412, 416 (11th Cir. 2011) (citing 42 U.S.C. § 12182(a)).

In particular, Section 12182(b)(2)(A)(ii) of Title III provides that discrimination in violation of the ADA includes

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations

42 U.S.C. § 12182(b)(2)(A)(ii). Thus, a violation of Title III can happen when a covered entity fails to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford . . . accommodations to individuals with disabilities." *Forbes v. St. Thomas Univ., Inc.*, 456 F. App'x 809, 812 (11th Cir. 2012) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)) (quotation marks omitted). But no violation occurs where the entity can show that making the requested modifications would "fundamentally alter the nature" of the services, facilities, or accommodations it provides. *See PGA Tour,*, 532 U.S. at 682 (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

-14-

Here, Carnival does not dispute that AOTS's clients with developmental disabilities such as autism are individuals with disabilities under the ADA.  Instead, Carnival argues that AOTS cannot satisfy the first element of a Title III ADA claim because it is not an individual with disabilities.  In other words, Carnival asserts that AOTS lacks standing.  The Court has already addressed this contention above and has concluded that AOTS satisfies the standing requirement.

As for the second element, while Carnival suggests in a footnote that the ADA may not apply to its cruises because its ships "spend the vast majority of cruising time in international waters" and "[t]he ADA does not apply extra-territorially to Carnival ships," Carnival concedes that the ADA applies to it at least "while Carnival's ships are within United States jurisdiction."  ECF No. 32 at 3 n.2; *id.* at 15 n.10.  Because Carnival makes no attempt to distinguish between the requested accommodations that would be relevant within United States jurisdiction and those that would not, the Court understands Carnival's concession that the ADA covers it at least when it is within United States jurisdiction as satisfaction of the second element of a Title III ADA claim.

Finally, with regard to the third element — whether Carnival discriminates within the meaning of the ADA against people with developmental disabilities, the Court must evaluate AOTS's requests for proposed reasonable modifications.  In so doing, courts must undertake three inquiries: (1) whether the requested modification is "reasonable," (2) whether it is "necessary" for the disabled person, and (3) whether it would "fundamentally alter the nature of" the service or accommodation at issue.  *See PGA Tour*, 532 U.S. 661, 683 n.38 (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)) (quotation marks omitted).  In its summary-judgment motion, however, Carnival does not challenge the requested modifications as unnecessary for developmentally disabled individuals, and the parties have not briefed that issue.  Rather, Carnival relies exclusively on its

-15-

claims that the requested modifications are not "reasonable" and that they would "fundamentally alter" the service or accommodation under consideration. Therefore, only for purposes of evaluating Carnival's Motion to Dismiss, the Court assumes without deciding that the requested modifications are "necessary." Obviously, if the requested modifications were not necessary, for this reason alone, AOTS would not be entitled to relief on its claims.

Finally, in evaluating the proposed modifications, the Court is mindful that the ADA guarantees those with disabilities "more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" *Baughman v. Walt Disney World Co.* , 685 F.3d 1131, 1135 (9th Cir. 2012) (citing 42 U.S.C. § 12182(a)). Thus, for public accommodations to fulfill the promise of the ADA, they "must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Id.* (citing *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128-29 (2005)).

Although the Eleventh Circuit has not addressed the allocation of burdens of proof in cases involving subsection (ii) of Section 12182(b)(2)(A), the court has adopted a burden-shifting framework in the context of cases involving subsection (iv) of Section 12182(b)(2)(A) — cases where a plaintiff alleges that an entity's failure to remove architectural and communications barriers of a structural nature discriminates in violation of Title III of the ADA. *See Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1273-75 (11th Cir. 2006). Under subsection (iv), discrimination occurs when an entity "fail[s] to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities . . . where such removal is readily achievable . . . ." 42 U.S.C. § 12182(b)(2)(A)(iv). Subsection (iv) is analogous to subsection (ii) in that both sections require reasonable modifications to remedy discrimination, unless the proposed

-16-

modifications are so burdensome that they satisfy the standard set forth in the respective sections.

Thus, it is not surprising that, in rendering the burden-shifting framework applicable to subsection (iv) cases, the Eleventh Circuit expressly adopted the reasoning of the Tenth Circuit in *Colorado Cross Disability Coalition v. Hermanson Family Limited Partnership I*, 264 F.3d 999 (10th Cir. 2001), *see Gathright-Dietrich*, 452 F.3d at 1274, which, in turn, relied in part on the analysis set forth by the Fifth Circuit in *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997) — a subsection (ii) case.[3]  *See Colorado Cross*, 264 F.3d at 1003-04.  Therefore, this Court finds the subsection (ii) framework established by *Johnson* to be instructive here.

Under the *Johnson* framework, the plaintiff bears the burden of proving that it requested a modification and that the modification sought is reasonable.  *Johnson*, 116 F.3d at 1059.  To satisfy this burden, the plaintiff must introduce evidence that the modification sought is "reasonable in the general sense, that is, reasonable in the run of cases."  *Id.*; *see also US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002) (in Title I ADA case, Court held that a plaintiff "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases") (citations omitted); *see also id.* ("plaintiff satisfies 'burden of production' by showing 'plausible accommodation') (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). The defendant may elect to present evidence to show the opposite, but the burden of proof on the issue

---

[3]*Johnson*, in turn, adapted the burden-shifting framework that the Fifth Circuit had previously applied in Title I ADA cases to arrive at its Title III, Subsection (ii) framework.  *See Johnson*, 116 F.3d at 1059 (citing *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683-84 (5th Cir. 1996)).  Although not appropriate for all issues arising under the ADA, courts regularly find analogous and therefore apply case law addressing one title of the ADA to cases involving another.  *See, e.g., Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) (citing *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997) and applying its Title I analysis in a Title II case).

regarding the reasonableness of the requested modification ultimately rests with the plaintiff. *Id.* (citing *Staron v. McDonald's Corp.*, 51 F.3d 353 (2d Cir. 1995)).

To meet this burden, in the context of subsection (iv) cases, the Eleventh Circuit has held, a plaintiff must present "sufficient evidence so that a defendant can evaluate the proposed solution to a barrier, the difficulty of accomplishing it, the cost [of] implementation, and the economic operation of the facility." *Gathright-Dietrich*, 452 F.3d at 1274 (citing *Colorado Cross*, 264 F.3d 999). Analogously, in a subsection (ii) case, then, a plaintiff must provide enough evidence to allow a defendant to evaluate the proposed modification, the difficulty of accomplishing it, the cost of implementation, and the effect of the proposed modification on the economic operation of the entity.

Generally, whether a proposed modification is "reasonable" presents a question of fact. *See Mary Jo C v. N.Y. State & Local Retirement Sys.*, 707 F.3d 144, 153 (2d Cir. 2013) (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996)) (holding in a Title II ADA case that whether a proposed accommodation is "reasonable" is a question of fact); *see also Crowder*, 81 F.3d at 1485 (holding that whether the plaintiffs' proposed alternatives to Hawaii's quarantine for guide dogs constitute reasonable modifications or fundamental alterations is a question of fact); *Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) ("The reasonableness of a requested accommodation [under Title I of the ADA] is generally a question of fact"). But where reasonable jurors could not find otherwise, a court may find a proposed modification to be reasonable or unreasonable as a matter of law.

If the plaintiff satisfies its burden to demonstrate that the proposed modification is reasonable, the burden then shifts to the defendant to prove that making the proposed modification would "fundamentally alter" the nature of the services or accommodation. *Id.* Unlike the inquiry

-18-

under the plaintiff's burden, the issue at this stage of the proceedings "focuses on the specifics of the plaintiff's or defendant's circumstances and not on the general nature" of the proposed modification. *Id.* at 1059-60.  If the defendant fails to meet this burden, it must make the requested modification. *Id.* at 1059.

Turning to Plaintiff's burden in the instant matter, while Carnival contends that AOTS has failed to identify proposed reasonable modifications to Carnival's policies, practices, and procedures, *see* ECF No. 45 at 7, in fact, the Complaint sets forth eleven[4] proposed modifications that the Complaint expressly characterizes as "Reasonable Accommodation[s]."[5]  *See* ECF No. 1 at 9-14. For the most part, these proposals seek specific modifications to Carnival's policies, practices, and procedures.  For example, AOTS requests that Carnival "[p]rovide private opportunities for developmentally disabled guests to have their picture taken at a specified time each day, or at least 50% of the number of the nights of the cruise, and provide staff to assist families and to attend to the guests in the event that disability characteristics manifest themselves during photo opportunities." *Id.* at 13.  In addition, Kay Strawderman, Carnival's Manager of Guest Access Services, testified that Michael Sobbell, the owner of AOTS, had made "several" requests for accommodations for his clients with developmental disabilities.  *See* ECF 32-2 at 32:16-:19.  Thus, as a matter of fact, AOTS

---

[4]Including the proposed reasonable accommodation regarding in-room babysitting, a claim that AOTS has since withdrawn, the Complaint identifies twelve proposed accommodations that it characterizes as "Reasonable Accommodation[s]."

[5]Title I of the ADA uses the term "reasonable accommodation," *see* 42 U.S.C. § 12112(b)(5)(A), whereas subsection 12182(b)(2)(A)(ii) employs the phrase "reasonable modification."  But "there appears to be little, if any, substantive difference" between the two phrases.  *Dahlberg v. Avis Rent A Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1105 (D. Colo. 2000).  This Court understands the Complaint's references to "reasonable accommodations" to refer to "reasonable modifications."

has proposed what it deems to be "reasonable accommodations."

Accordingly, the Court must consider whether AOTS has satisfied its burden to show that each of the proposed modifications is reasonable "in the run of cases." The Court considers each proposed modification in turn:

1.    **Camp Carnival: "[T]he hiring of a sufficient number of properly trained and skilled staff. Such staff must be available on sequential shifts, at all times when Carnival daycare is open to children."** ECF No. 1 at 9.

This request involves two components: additional staffing of Camp Carnival and additional training and skills of Camp Carnival staff. Regarding the first aspect, Michael Sobbell, the owner of AOTS, testified that through this request, AOTS seeks an accommodation of the presence of one staff member for every three children with developmental disabilities using Camp Carnival services. ECF No. 32-1 at 85:16-88:22; *see also* ECF No. 32-3 at 2, III.D. As AOTS envisions this proposed modification working, a patron traveling with a child with developmental disabilities, including autism, would notify Carnival in advance of sailing — specifically, AOTS proposes sixty days before the ship leaves — so Carnival could make arrangements to staff Camp Carnival accordingly for that particular cruise. ECF No. 32-3 at 5, II.C.3. AOTS further proposes that Camp Carnival could cross-train its staff to work at Camp Carnival so Carnival could utilize its employees already onboard working in different areas of the ship to fulfill the increased staffing needs of Camp Carnival when the workers might have down time in their other positions. *Id.* at 8, at III.E.3 & 4.

With respect to the part of the request for "properly trained and skilled staff," AOTS asserts that it seeks for Carnival to provide at least one individual per room or physically separated setting, who has some general training in the common characteristics of individuals with developmental disabilities, including autism, and who has some training in effective interventions to redirect

unwanted, inappropriate, or disruptive behavior that may be directly related to the disabling condition. ECF No. 38 at ¶ 15 (citing ECF No. 32-3 at 2, II.A). These requests are specific enough to allow Carnival to be able to assess the proposed modifications, the difficulty of accomplishing them, the cost of implementation, and the effect of the proposed modifications on the economic operation of Carnival.

For its part, Carnival responds that it does not deny access to Camp Carnival to children with special needs, including autism. ECF 32-2 at 38:2-39:22. In addition, Carnival notes that it permits the parent or care giver of a special-needs child to attend Camp Carnival with the child if the parent so desires. *See id.* at 40:23-41:1. As for its staff's experience working with children with special needs, Carnival asserts that its Camp Carnival staff "deal[s] with special-needs children on a weekly basis . . ." and "on every cruise." *Id.* at 41:7-:12; 42:10-:13.

To the extent that Carnival's practices regarding children with autism at Camp Carnival may be construed as a proposed alternative reasonable modification, it is true that under the ADA, an individual with a disability "is not entitled to the [modification] of her choice, but only to a reasonable [modification]," *see Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (citation and quotation marks omitted) (applying standard in a Title I ADA case). But 28 CFR § 36.303(a) requires public accommodations to "take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services," unless the public accommodation can demonstrate a fundamental alteration of the services provided. Under this regulation, public accommodations may not "rely on an adult accompanying an individual with a disability to interpret or facilitate communication" except in limited

-21-

circumstances that Carnival does not assert apply here.  *See* 28 CFR § 36.303(c)(3).

In significant part, AOTS seeks the requested modification to Camp Carnival's staffing in order to allow children with autism to communicate with Camp Carnival staff.  As Dr. Rachel Potter, AOTS's expert witness explains,

> a child with limited verbal abilities who is seeking attention or trying to avoid a situation may make unintelligible noises or repetitive motions until attention is momentarily given or until the thing they are trying to avoid . . . is removed.  Although these noises or motions may appear atypical and other children and untrained staff may see them as problematic, a trained staff member might approach the situation as an opportunity to determine what the child is trying to communicate.

*See* ECF No. 32-3 at 2 at II.A.1.a.  Thus, allowing an autistic child's parent to accompany the child to Camp Carnival does not qualify as a reasonable modification unless Carnival can demonstrate that any other proposed modification would cause a fundamental alteration of the services that Camp Carnival provides.  Moreover, "full and equal enjoyment" of Camp Carnival by children with developmental disabilities contemplates allowing such children the independence from parents, the opportunity to interact with and enjoy camp counselors, and the ability to interact freely with peers without a parent's involvement in the relationship, that a camp setting offers.  Accommodating children with developmental disabilities only by requiring a parent to accompany them to Camp Carnival could deprive such children of "full and equal enjoyment" of the Camp Carnival experience.  Therefore, the Court returns its focus to AOTS's proposed modifications.

With respect to whether AOTS's proposed modifications are reasonable in the "run of cases," this Court finds that a reasonable jury could find that they are.  A modification is reasonable if it is both "efficacious" and "proportional to costs."  *Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th

Cir. 2013) (citations and quotation marks omitted) (discussing reasonable accommodations under Title II of the ADA); *Filar v. Bd. of Educ. of the City of Chicago*, 526 F.3d 1054, 1068 (7th Cir. 2008) (same); *see also McMillan v. City of New York*, 711 F.3d 120, 127 (2d Cir. 2013) (citation omitted) (in a Title II ADA case, "[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits").

Regarding the proposed special-needs training, Carnival already requires its staff to undergo "Guest Sensitivity Training."  *See* ECF No. 32-7.  Among other topics, this training specifically addresses compliance with the ADA.  *See id.* at 3.  In particular, this training provides instruction on interacting with guests with mobility impairments, guests who have hearing loss, and guests who have vision loss.  *See, generally, id.*  Since a forum for disability-related training already exists, general training in the area of developmental disabilities such as autism would not necessarily require the scheduling of a separate training session.  Moreover, because one of the qualifying areas of experience for a person to be hired as Camp Carnival staff includes "special needs worker,"[6] *see* ECF No. 32-8 at 1-3 ("special needs worker[s]" and camp counselors at special-needs camps), Carnival may well already have on its staff individuals who are qualified to provide basic training

---

[6]Among other requirements, Camp Carnival staff must be certified in cardiopulmonary resuscitation and First Aid, "[m]ust be willing to work with . . . children with special needs." ECF No. 32-8 at 1; *see also* ECF No. 38-1 at 7:15-:21 (all Camp Carnival employees must take First Aid, CPR, and emergency training).  In addition, they must either hold at least a two-year degree or diploma in child care, teaching, psychology, recreation, "[s]pecial [n]eeds . . . ," child and youth work, early childhood education, educational assistance, or a creative field, and have two years' experience in the chosen field, or have two years' experience working as a camp counselor (including at "[s]pecial [n]eeds [c]amps"), at the YMCA or other after-school programs, at any professional child-care setting, or leading large groups of children as a sports coach, and they must have reference letters from prior employers.  *Id.*  Finally, Kay Strawderman testified that Camp Carnival staff "deal[s] with special needs children on a weekly basis" and on "every cruise."  ECF No. 32-2 at 41:7-:12; 42:10-:13.

in the area of the needs of children with developmental disabilities.  As for the one-to-three ratio of staff to children with developmental disabilities, AOTS's proposal that families with special-needs children notify Carnival sixty days before setting sail and its proposal to cross-train other staff onboard who may otherwise be experiencing down time appears facially to limit substantially — perhaps to a negligible point — the costs associated with the proposed increased staffing, particularly in light of the relatively small numbers of children with developmental disabilities with whom AOTS sails.

In return, AOTS's expert witness, Dr. Potter, has opined that the benefits accruing from training and increased staffing will be substantial.  *See, generally,* ECF No. 32-3.  Among other reasons, Dr. Potter has stated that additional staff are needed for autistic children and other children with developmental disabilities because of safety concerns such as keeping children in the designated areas for Camp Carnival and efficiently evacuating children as necessary to muster stations if warranted, as well as for the purpose of allowing autistic children and children with other developmental disabilities to experience "full and equal enjoyment" of Camp Carnival like children without such disabilities experience, by permitting children with disabilities  to communicate their needs and desires and giving them "opportunities for independent play and activities, as well as providing structured games and activities in which each child is encouraged to . . . participate . . . ." *Id.* at 1.  Because Carnival is uniquely in possession of the information necessary to determine any costs associated with these proposed modifications, and further, because the proposed modifications do not appear facially to require the expenditure of significant amounts of money by Carnival versus the anticipated efficaciousness of the proposed modifications, AOTS has satisfied its initial burden to identify a modification that a jury could find to be reasonable.

Nor, as Carnival suggests, do the proposed modifications require Carnival to provide "services of a personal nature" that 28 CFR § 36.306 states that public accommodations need not make available. Section 36.306 explains that a public accommodation need not provide its customers with "services of a personal nature including assistance in eating, toileting, or dressing." 28 CFR § 36.306. Nothing in AOTS's proposed modification seeks for Camp Carnival staff to help children with disabilities eat, use the bathroom, dress, or engage in other similar activities beyond what Camp Carnival does for children of the same age without disabilities. Neither is a three-to-one ratio the same thing as seeking for Carnival to assign a personal assistant to each child with disabilities for the entirety of that child's stay at Camp Carnival. While it is true that children with developmental disabilities such as autism may require momentary individualized attention at times, so do children who do not have such disabilities. As Dr. Potter points out, like some children with developmental disabilities, sometimes children without disabilities withdraw from their peer groups or become the subjects of unkind treatment from their peer groups, requiring momentary individualized attention. *See* ECF No. 32-3 at 6. But that does not make the attention that Camp Carnival gives such children "services of a personal nature" not required by Section 36.306 any more than it makes momentary individualized attention to children with disabilities "services of a personal nature."

Thus, the burden shifts to Carnival to demonstrate that the proposed modifications would work a fundamental alteration of the Camp Carnival services that it provides. Here, Carnival does not even try to satisfy its burden. While this Court can envision a scenario where the costs of providing the requested modification may be prohibitively high or otherwise might create a fundamental alteration of the Camp Carnival program, Carnival has submitted absolutely no

evidence whatsoever to make this showing.  Yet if evidence exists to show that the proposed modifications would fundamentally alter Camp Carnival, Carnival is in a unique position to know that.  Because Carnival makes no effort to demonstrate such a showing, a question of fact continues to exist regarding whether the proposed modifications to Camp Carnival constitute reasonable modifications under the ADA, and summary judgment must be denied as it pertains to this proposed modification.

2.     **Carnival Teen Club: "[T]he hiring of a sufficient number of properly trained and skilled staff to provide similar services and activities [to those offered at Carnival Teen Club], in a similar environment.  Acceptable similar environments can include an alternate venue or same teen club venue.  Such staff must be available on sequential shifts, at all times when Carnival teen club is open to teens."**  ECF No. 1 at 10.

The analysis of this proposed modification is the same as that for Camp Carnival.  Therefore, the Court relies on the analysis set forth above.

3.     **Port check-in: "Families of developmentally disabled individuals should be permitted to either check-in via an expedited check-in counter or by an expedited process designed for families with a developmentally disabled guest, and position trained staff members at the check-in and embarkation waiting areas in order to greet and assist developmentally disabled passengers while waiting for ship embarkation (after check-in)."** ECF No. 1 at 10-11.

Carnival has responded to this request by providing AOTS with the name of a Carnival employee to contact when the AOTS group arrives at the ship, so individuals with autism and other developmental disabilities, who lack the ability to remain focused and engage in generally accepted conduct while in a crowd or a line for extended periods of time, may receive expedited check in. *See* ECF No. 32-2 at 48:13-:20.  As Carnival explains, it can expedite check in of groups with special needs when they arrive at one time, but it is unable to do so when they board at scattered times throughout the day.  *See id.* at 39:17-:18; 48:23-51:2.   AOTS complains that this

accommodation is not sufficient since its clients do not all arrive at the port at the same time because the nature of their disabilities causes outbursts and other circumstances that may draw families with children with developmental disabilities off schedule and may prevent them from being able to ensure arrival at a specific time.  *See* ECF No. 32-1 at 124:24-128:25.

Carnival's proposed modification is reasonable and accommodates the behavioral issues that families with children with developmental disabilities such as autism may experience when required to stay in one place without outlets for their children for extended periods.  Nor is AOTS's objection to this proposed modification sufficient to render it unreasonable as a matter of law.  While the Court is not unsympathetic to the sometimes-challenging circumstances that families with children with developmental disabilities may face, particularly when traveling, in order to participate in a Carnival cruise, AOTS has provided no evidence that its clients are unable to arrive at a designated time for check in other than Sobbell's bald assertion to that effect.  Particularly in light of the fact that, to participate in a Carnival cruise, AOTS's clients must  find a way to get to the port on time to board the ship before it departs, and further, that AOTS is able to gather its clients all at the same time for dining, *see* ECF No. 32-1 at 145:11-:15, photograph opportunities, *id.* at 152:2-:7, and tender departures, *id.* at 152:23-154:1, Sobbell's naked claim that the proposed modification is not sufficient does not suffice.  It is not unreasonable for Carnival to expect AOTS clients to find a way to arrive on time to enjoy expedited check in if that is important to them.

Not only has AOTS failed to demonstrate that Carnival's proposed modification is insufficient, but a reasonable jury could not find that AOTS's counterproposal is reasonable.  Carnival conducts its embarkation process over several hours.  AOTS's proposed modification would require Carnival either to have designated staff for that entire period who check in only those

-27-

relatively few passengers traveling with guests with developmental disabilities or to have its general

check-in staff drop everything — including their accommodation of other guests — to check in

passengers traveling with guests with developmental disabilities whenever they happen to arrive

throughout the multiple-hour period.  Quite simply, that is not reasonable when Carnival is willing

to provide guests with developmental disabilities with an expedited check-in process that requires

only that such patrons arrive at a designated time.[7]

Finally, the Court cannot find that providing the reasonable modification that Carnival has

voluntarily been making works a fundamental alteration to Carnival's services for the simple fact

that Carnival has submitted no evidence at all on this issue.  As a result, Carnival has not satisfied

its burden to demonstrate a fundamental alteration, and summary judgment must be denied.

4. **Muster drill: "Provide a designated muster drill area for individuals with developmental disabilities and their families, with an amended process for communicating drill information. Provide trained staff to assist in the specially designated muster drill area in order to help with handling and care of guests with special needs, and provide headsets for individuals with special needs who are affected by drill alarms."** ECF No. 1 at 11.

---

[7]While the Court concludes that several of Carnival's proposed modifications are reasonable and sufficient under the ADA — including this one, the Court cannot grant summary judgment for Carnival on these issues because Carnival seeks a judgment that the ADA does not require any reasonable modifications — whether proposed by AOTS or by Carnival.  Although the plaintiff bears the burden of demonstrating that a modification is "necessary," Carnival neither argued nor briefed that the modifications proposed or voluntarily provided by Carnival are not "necessary" for people with developmental disabilities.  Instead, Carnival's brief implicitly conceded that showing, focusing instead on AOTS's burden to show the reasonableness of the proposed modifications.  So, as noted *supra*, for purposes of determining this Motion for Summary Judgment only, the Court assumes that reasonable modifications addressing the issues raised by AOTS are "necessary."  If reasonable modifications are "necessary" and a reasonable modification has been proposed, the Court cannot find that the ADA does not require any modifications, as Carnival urges in its Motion for Summary Judgment.  Accordingly, although several of the modifications that Carnival has been voluntarily providing to AOTS qualify as "reasonable," the Court cannot grant summary judgment to Carnival in the form that Carnival seeks.  Consequently, summary judgment must be denied.

Carnival has accommodated AOTS's clients with developmental disabilities by providing them with a private lifeboat drill in a separate room, a modification that it provides to all large groups of people with disabilities, including those who are blind or deaf.  ECF No. 32-2 at 51:13-:24. AOTS has not submitted any evidence to show that this modification is insufficient in any way.  To the contrary, the only evidence that AOTS has presented is that Carnival's modification is reasonable and adequate.  *See* ECF No. 32-1 at 36:3-:8.[8]  Accordingly, the Court finds Carnival's proposed modification to be sufficient.

As with the other modifications, the Court cannot find that providing the reasonable modification that Carnival has voluntarily been making creates a fundamental alteration of Carnival's services because Carnival has filed no evidence at all on this issue.  As a result, Carnival has not satisfied its burden to demonstrate a fundamental alteration, and summary judgment must be denied.

5.      **Dining room:  "Position tables for developmentally disabled guests against walls that have windows, in order to allow guests to access the windows and occupy their time while waiting for service, without disrupting other cruise guests. Provide for expedited food service for families with developmentally disabled children, keeping in place the overall process, but expediting so that it lasts for no more than forty-five (45) minutes. Provide skilled staff to assist families during dinner and to attend disabled guests when needed and when disability characteristics manifest."**  ECF No. 1 at 11-12.

---

[8]Regarding muster drills, Sobbell testified as follows:

Q:      You've asked for private muster drills.  They've provided you with a private muster drill just for your folks, correct?

A:      Yeah.

Q:      What else do you want them to do?

A:      I, I think we're good there.

Regarding dining issues, Sobbell attested that Carnival has provided AOTS's clients with "an area together by the windows, by an exit, so that's working fine."  ECF No. 32-1 at 143:11-:19; *see also id.* at 145:5-:10 ("[W]e have no problem with the effort and the, the outcome of getting us seated where we requested.  We really don't have an issue anymore.").  But AOTS continues to complain about the speed of delivering food to the tables.  *See id.*  As Sobbell explained the issue, some of the servers "don't understand to hurry a little bit.  That's all."  *Id.* at 144:9-:16.

The Court construes Carnival's response to AOTS's requests on this issue as a counter proposed modification and finds Carnival's proposed modification to be reasonable and sufficient.  As phrased, AOTS's complaints about the speed of some servers' service does not attack a policy or procedure of Carnival and does not suggest a particular modification to Carnival's serving process.  Instead, it simply bemoans the individual service of some servers.  In the absence of a specific proposal for addressing the speed of service of some servers, AOTS has not met its burden to identify a reasonable modification.

As with the other proposed modifications, Carnival has submitted no evidence at all in support of its claim that the proposed modification of window seating would fundamentally alter Carnival's services.  Accordingly, and because Carnival has implicitly conceded the necessity of the proposed modification by not contesting it and by not briefing the issue, the Court cannot grant summary judgment for Carnival on this issue since it seeks a judgment that no modification of any type is required under the ADA.

**6.    Use of venues:   "Provide specified times when these venues are reserved for developmentally disabled guests and provide for skilled staff to accompany and assist guests in these venues."** ECF No. 1 at 12.

On this issue, AOTS complains not that it has been denied use of any venue for any private

matter, but rather, that Carnival charges AOTS for the use of its venues for private matters.  ECF No. 32-1 at 148:2-:16.  In particular, AOTS asserts that its clients with developmental disabilities are not able to enjoy certain venues during public times because of their disabilities.  *Id.*  For example, Sobbell testified that teens and adults with developmental disabilities such as autism are not able to use venues such as the night club and the teen club when dancing is offered because "the music is too loud, strobes induce seizures, bullying and not enough staff in the teen area."  *Id.* at 148:17-149:8.  While Carnival makes club space available to AOTS to conduct its own comparable dancing events, Carnival charges AOTS a $100.00 fee for one of its employees to come to the venue and turn the music on and off.  *Id.* at 149:18-:25.  Carnival responds that whenever any private group requests the use of a venue for a private function, it charges them the $100.00 fee that it requires AOTS to pay.  *See id.* at 150:1-:8.

As noted previously, Carnival does not take issue with AOTS's assertions that a private venue is necessary for its clients to enjoy the same experience that other guests who do not have developmental disabilities enjoy at Carnival's night club and teen club when it offers dancing. Because Carnival does not contest the necessity for people with developmental disabilities such as autism to avoid loud music and strobe lights in order to be able to enjoy a dancing venue, in order to fulfill the ADA's promise to provide those with qualifying disabilities "full and equal enjoyment" of public accommodations, Carnival must make available to AOTS clients a dancing venue that does not have these features.  Carnival has apparently chosen to do this by offering AOTS the opportunity to hold private dance parties for the fee of $100.00.

Under 28 CFR § 36.301(c), however, "[a] public accommodation may not impose a surcharge on . . . any group of individuals with disabilities to cover the costs of measures, such as . . .

reasonable modifications in policies, practices, or procedures, that are required to provide that . . . group with the nondiscriminatory treatment required by the Act . . . ." Because Carnival implicitly concedes that a private dance party is necessary to allow people with developmental disabilities such as autism to enjoy the same dance parties that people without disabilities do, Carnival may not charge AOTS for providing it with the opportunity for its clients to enjoy comparable dance parties.

Nor has Carnival presented any evidence to show that not charging AOTS $100.00 for providing comparable venues to enable its clients to enjoy services that they otherwise would not be able to take advantage of because of their disabilities would fundamentally alter the services that Carnival offers. Accordingly, summary judgment for Carnival must be denied on this issue.

7. **Photo opportunities: "Provide private opportunities for developmentally disabled guests to have their picture taken at a specified time each day, or at least 50% of the number of the nights of the cruise, and provide staff to assist families and to attend to the guests in the event that disability characteristics manifest themselves during photo opportunities."** ECF No. 1 at 13.

AOTS asserts that people with developmental disabilities require separate photograph sessions because they have trouble waiting in lines, and the problems are compounded by the pressure of having many other people watching the behavior of children with such disabilities while the families are waiting and while the photographs are being taken. ECF No. 32-1 at 151:13-:7. Thus, AOTS suggests that Carnival should provide people with developmental disabilities one or two opportunities per cruise to have their photographs taken in a separate session scheduled just for patrons with such disabilities. *Id.* at 152:2-:7. Carnival has submitted evidence that, in response to AOTS's request in this regard, Carnival has, in fact, provided AOTS with a private photograph session onboard so AOTS clients could have their pictures taken without interruptions or lines. ECF No. 32-2 at 53:23-54:8.

The Court construes Carnival's provision of private photograph sessions to AOTS families as a proposed counter modification and concludes that this modification is reasonable. Nevertheless, the Court cannot grant summary judgment to Carnival on this issue because Carnival seeks a judgment that the ADA requires no modifications. Since Carnival has implicitly conceded the necessity of the modifications and because Carnival has submitted no evidence that the modification would fundamentally alter the services that Carnival offers, however, the Court cannot conclude that, where a reasonable modification is available, no such modification is required.

8. **Tender: "Provide a specific time of day when families with developmentally disabled children can board an otherwise empty tender and provide such families with a designated space large enough for each child to have sufficient room to move. Provide trained staff to accompany families on the tender to attend to the guests and to assist as needed when disability characteristics manifest themselves. Provide staff trained to be able to accompany such guests when in port and to return with them on the tender for assistance."** ECF No. 1 at 13.

Tenders are smaller boats that shuttle passengers between the cruise ship and land. *See* ECF No. 32-1 at 152:23-153:10. As Sobbell testified, AOTS seeks, effectively, an appointment for the tender, so its clients do not have to wait in line, where challenging behaviors may have a tendency to manifest themselves. *Id.* at 153:15-154:1. Sobbell further stated that Carnival has supplied this modification, but the sole issue concerns standardization of providing it. *Id.* at 154:4-155:5.

In view of the fact that Carnival has been able to accommodate passengers wtih developmental disabilities by scheduling specific times for them to take tenders to and from shore, a jury could find this proposed modification to be reasonable. Nor has Carnival submitted any evidence to demonstrate that providing this modification on a standardized basis would cause a fundamental alteration to the services that Carnival offers. As with the other proposed reasonable modifications, however, because Carnival has implicitly conceded the necessity of such

modifications, the Court is not able to grant summary judgment to Carnival on this issue, as Carnival

seeks judgment that no modifications are required by the ADA.

9. **Port excursions: "Provide a properly trained staff member to accompany developmentally disabled persons upon request."** ECF No. 1 at 14.

With regard to this particular proposed modification, Sobbell conceded during his testimony

that it would not be reasonable to require a Carnival staff member to accompany every person with

developmental disabilities when that person leaves the ship for an excursion. ECF No. 32-1 at

156:13-157:7. Sobbell further indicated that he could not identify a precise proposed modification

regarding excursions. *See id.* at 155:6-161:23. Under these circumstances, AOTS has failed to

satisfy its burden to identify a proposed reasonable modification to Carnival's services as they relate

to port excursions, and summary judgment must be granted for Carnival.

10. **Disembarkation: "Families of developmentally disabled individuals should be permitted to disembark by an expedited disembarkation process to be designed by Carnival in compliance with all applicable laws and regulations applicable to the disembarkation process."** ECF No. 1 at 14.

Carnival has responded to this request by providing AOTS with a room in which to wait until

Carnival disembarks AOTS clients as a group, so the children with developmental disabilities need

not wait in a crowded area for disembarkation. ECF No. 32-2 at 54:18-55:8; ECF No. 32-1 at 140:5-

:23. In view of the fact that Carnival has already been able to provide this modification and that

Carnival has implicitly conceded for purposes of this Motion the necessity of a reasonable

modification pertaining to disembarkation, a reasonable jury could find this to be a reasonable

modification. And, as with the other proposed modifications, Carnival has presented no evidence

to suggest that requiring such a modification would cause a fundamental alteration of Carnival's

services. Summary judgment may not be granted for Carnival on this issue since Carnival seeks a

judgment that no reasonable modification is required.

11. **Publication of services: "Publicize availability of services and facilities that provide fair and equal access to developmentally disabled persons on each Carnival cruise, as long as guests inform Carnival Corporation, or as long guests inform an affiliated "Developmental Disability Cruise Service Provider" 60 days prior to the cruise."** ECF No. 1 at 14.

Carnival already provides information on its website for guests traveling with people with special needs, including developmental disabilities. ECF No. 32-1 at 74:21-76:4. In addition, Carnival's website contains a telephone number and an email link to allow people to contact Carnival representatives about their particular special-needs concerns. *Id.* AOTS identifies no other specific proposed modifications for Carnival to make in the area of publication of services.

A reasonable jury could find this modification that Carnival has already offered to be reasonable. Nor has Carnival submitted any evidence to show that continuing to provide these services would fundamentally alter Carnival's other services in any way. In view of these facts and because Carnival seeks a judgment that the ADA does not require it to make any of the proposed modifications, the Court must deny summary judgment to Carnival on this issue.

*D. Count II*

Carnival argues that the Court should grant summary judgment for it on Count II, AOTS's claim for unjust enrichment, because, essentially, this claim seeks damages for alleged violations of the ADA, but the ADA does not provide a private cause of action for damages. While it is true that the ADA does not provide a private cause of action for damages, it does not necessarily follow that AOTS therefore may not sustain a claim for unjust enrichment.

In Count II, AOTS alleges that it has "filled the void left by Carnival's failures" under the ADA. *See* ECF No. 1 at ¶ 26. More specifically, AOTS claims that it has incurred "great expense"

in "providing appropriately trained and skilled staff, and other accommodations, so as to make Carnival cruise ships accessible to the developmentally disabled, as required by the ADA." *Id.* Through its actions, AOTS contends, it has bestowed a benefit on Carnival for which AOTS's costs should be reimbursed, or else Carnival would enjoy unjust enrichment. *Id.* at ¶¶ 27-29.

Under Florida common law, to state a claim for unjust enrichment, a party must show all of the following: "(1) a benefit was conferred upon [the party allegedly enriched], (2) . . . [the enriched party] either requested the benefit or knowingly and voluntarily accepted it, (3) . . . a benefit flowed to the [enriched party], and (4) . . . under the circumstances, it would be inequitable for the [enriched party] to retain the benefit without paying the value thereof." *CMH Homes, Inc.v. LSFC Co., LLC*, 118 So. 3d 964, 965 (Fla. 1st DCA 2013) (citation omitted) (modifications made by *CMH Homes, Inc.*, Court). Carnival does not suggest that the Complaint does not sufficiently allege facts that would establish these elements; rather, it argues that the ADA precludes the availability of a cause of action for unjust enrichment that results from an entity's failure to comply with the ADA.

In urging this position, Carnival correctly notes that Title III of the ADA does not create a damages remedy in an action initiated by a private party. *See Jairath v. Dyer*, 154 F.3d 1280, 1283 & 1283 n.8 (11th Cir. 1998) (describing an injunction as "[t]he only remedy available under the ADA"); *see also Bakery v. Kaplan*, 518 F. App'x 813, 814 (11th Cir. 2013) (citing *Jairath*, 154 F.3d at 1283 and n.7). This Court further recognizes that "[i]t is . . . an 'elemental canon' of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies." *Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989) (citation omitted). As the Supreme Court has noted, "[i]n the absence of strong indicia of contrary congressional intent, [courts] are compelled to conclude that Congress provided precisely the

-36-

remedies it considered appropriate." *Id.* (citations and quotation marks omitted).

Thus, the Court examines Title III of the ADA to discern congressional intent on the precise issue pending.  On the one hand, Title III's enforcement scheme incorporates both private and public causes of action.  *See* 42 U.S.C. § 12188.  With regard to private individuals, they may obtain only injunctive and other prospective relief.  *See Norkunas v. Seahorse NB, LLC*, 444 F. App'x 412, 416-17 (11th Cir. 2011) (citing 42 U.S.C. § 12188(a)(1)); *Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 50 (1st Cir. 2006) ("a private party may obtain only forward-looking relief; damages for past harms are not available" under Title III of the ADA).  The Attorney General, however, may vindicate public rights — including the rights of individuals who are aggrieved and whose circumstances raise an "issue of general public importance" — by obtaining monetary relief and the imposition of civil penalties, in addition to injunctive and declaratory relief.  *See* 42 U.S.C. §§ 12188(b)(1)(B)(ii), 12188(a)(2)(B) & (C).  These provisions reflect that Congress specifically considered the appropriate role of monetary relief in the overall enforcement scheme of Title III of the ADA, and it determined that such a remedy should not be available in private-enforcement actions under the ADA.

On the other hand, 42 U.S.C. § 12201(b) provides, in relevant part, "Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter. . . ."  42 U.S.C. § 12201(b).  As the Eleventh Circuit has expressed time and again, "When we construe a statute, 'we must begin, and often should end as well, with the language of the statute itself.'"  *Silva-Hernandez v. U.S. Bureau of Citizenship & Immigration Servs.*, 701 F.3d 356, 361 (11th Cir. 2012) (citation omitted).  Section 12201(b) provides clear evidence of congressional intent that the ADA

not be construed to preempt or otherwise nullify any greater remedies that state-court law may provide to people within the scope of the ADA's protections.

But even if Section 12201(b) were somehow ambiguous on this issue, Congress made apparent its intent that state-law remedies not be limited by the ADA in the reports accompanying the legislation that became the ADA.  As the House of Representatives Report states,

> In other words, all of the rights, remedies and procedures that are available to people with disabilities under other federal laws or other state laws (including state common law) are not preempted by this Act.  This approach is consistent with that taken in other civil rights laws.  The basic principle underlying this provision is that Congress does not intend to displace any of the rights or remedies available under other federal or state laws (including state common law) which provide greater or equal protection to individuals with disabilities.

H.R. Rep. 101-485(II), at 135-36 (1990), 1990 U.S.C.C.A.N. 303, 418-19; *see also* H.R. Rep. 101-485(III), at 70 (1990), 1990 U.S.C.C.A.N. 445, 493.  Significantly, the House Report further clarifies, "[S]tate tort claims confer greater remedies and are not preempted by the ADA.  A plaintiff may join a state tort claim to a case brought under the ADA."  H.R. Rep. 101-485(III) at 70, 1990 U.S.C.C.A.N. at 493.  Thus, while state tort claims are not claims directed expressly at the protection of individuals with disabilities, Section 12201(b) nonetheless permits a plaintiff to bring such claims simultaneously with an ADA claim.[9]

Nor does the Eleventh Circuit's ruling in *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1530-31 (11th Cir. 1997), alter the analysis.  In *Holbrook*, the Eleventh Circuit concluded that an individual may not maintain a claim under 42 U.S.C. § 1983 for a violation of Title II of the ADA. Crucial to this determination, the court noted the "extensive, comprehensive remedial frameworks

---

[9]For an example of such a tort claim that relied on the ADA to establish the requisite standard of care, *see Lugo v. St. Nicholas Assocs.*, 772 N.Y.S. 2d 449 (N.Y. Sup. Ct. 2003).

that address[ed] every aspect of [the plaintiff's] claims under section 1983" and opined that allowing a plaintiff to sue for the same violation under both statutes would be providing the plaintiff with "two bites at precisely the same apple." *Id.* at 1531.  The court further approved of the reasoning of the court in *Holmes v. City of Chicago*, 1995 WL 270231, *3-5 (N.D. Ill. 1995), which held that the enforcement scheme of Title I of the ADA precludes the bringing of a claim under § 1983 for the same injury or injuries, largely for the same reason.

The unjust-enrichment claim in this case differs from a Section 1983 claim in a Title I or a Title II ADA claim.  Significantly, unlike Titles I and II of the ADA, Title III provides no damages remedy for a violation of its provisions.  Thus, unlike the ADA and Section 1983 claims at issue in *Holbrook*, a Title III ADA claim and an unjust-enrichment claim based on the same activity do not constitute "two bites at precisely the same apple." *Holbrook*, 112 F.3d at 1531.  Moreover, it does not appear that the parties asked the courts to consider what effect, if any, Section 12201(b) had on the issues in *Holbrook* and *Holmes*.  As a result, *Holbrook* does not require dismissal of the unjust-enrichment claim.

Carnival's reliance on *Johnson v. Prospect Waterproofing Co.*, 813 F. Supp. 2d 4, 10 (D.C. Cir. 2011), is likewise inapposite.  In that case, the plaintiffs sought to bring common-law claims, including a *quantum-meruit* claim, to recover benefits under the Davis-Bacon Act.  The court dismissed the plaintiffs' common-law claims because "bringing a state law claim is clearly an impermissible end run around the Davis-Bacon Act" and allowing such a claim "would severely undermine the specific remedial scheme established by Congress." *Johnson*, 813 F. Supp. 2d at 10 (citation and internal quotation marks omitted).

Unlike the Davis-Bacon Act, however, the ADA includes a specific expression of

congressional intent that the ADA does not preempt other causes of action that provide greater or equal protection for the people whom the legislation was enacted to protect. *See* 42 U.S.C. §12201. This Court recognizes that the general rule provides for preemption of state-law and common-law remedies where Congress has enacted a comprehensive enforcement and remedial scheme through federal legislation.   But where, as here, a "strong indicia of contrary congressional intent," *Karahalios*, 489 U.S. at 533 — indeed, an express provision within the governing statute — exists demonstrating that Congress intended that other causes of action not be preempted or otherwise nullified by the ADA, the Court is bound to follow the law as Congress wrote it.  Accordingly, the Court declines to dismiss Count II of the Complaint merely because it seeks a remedy that the ADA does not provide.[10]

### III.  Conclusion

For the foregoing reasons, Carnival Corporation's Motion for Summary Judgment [ECF No. 32] is **GRANTED IN PART and DENIED IN PART** as follows: the Motion is **GRANTED** as it relates to the claim regarding port excursions within Count I of the Amended Complaint.  In all other regards, the Motion is **DENIED**.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 12th day of December 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:
The Honorable Patrick M. Hunt
Counsel of Record

---

[10]This Order does not opine on the substantive viability of Count II, as Carnival has not sought summary judgment on that basis.